No. 36,511

JOSEPH B. FLEMING and AARON COLNON, Trustees of the Estate of The Chicago, Rock Island & Pacific Railway Company, *Appellants*, v. A. S. FERGUSON, County Treasurer of Wyandotte County, et al., *Appellees*.

No. 36,512

THE UNION PACIFIC RAILROAD COMPANY, *Appellant*, v. A. S. FERGUSON, County Treasurer of Wyandotte County, et al., *Appellees*.

(171 P. 2d 274)

Opinion filed July 6, 1946.

*O. B. Eidson,* of Topeka, and *N. E. Snyder,* of Kansas City, argued the cause, and *T. M. Lillard, P. H. Lewis* and *James W. Porter,* all of Topeka, were on the briefs for appellant Union Pacific Railroad Company; *J. E. DuMars* and *Clayton M. Davis,* both of Topeka, were on the briefs for appellants Joseph B. Fleming and Aaron Colnon.

*Leonard O. Thomas,* of Kansas City, argued the cause, and *Arthur J. Stanley,* of Kansas City, was on the briefs for Wyandotte township, Arthur Creten as Trustee et al.; *J. E. Schroeder,* of Kansas City, was on the briefs for appellee A. S. Ferguson.

*T. F. Railsback,* of Kansas City, for Lake of the Forest Club, Mrs. John Tiderman and Charles Fry, as *amici curiae.*

*James G. Martin,* of Wichita, and *Robert B. Fizzell,* of Kansas City, Mo., as *amici curiae.*

The opinion of the court was delivered by

SMITH, J.: These were actions to recover taxes that had been paid under protest. Judgment was for the defendants. Plaintiffs have appealed.

One action was brought by The Union Pacific Railroad Company, the other by the trustees of the estate of The Chicago, Rock Island and Pacific Railway Company. The pleadings and findings are identical except for amounts. Hereafter in this opinion the pleadings and findings with reference to The Union Pacific Railroad Company will be discussed. After identifying the parties, the petition alleged that the defendant, prior to 1942, had constructed a water-supply system pursuant to the provisions of chapter 80, article 16 of the General Statutes of 1935; that this system was constructed with the aid of funds granted to the township by the Works Progress Administration of the United States; that for the purpose of raising other funds to pay for the construction defendant in 1938 issued its revenue bonds in the amount of $175,000; that under the terms of article 16, chapter 80, G. S. 1935, the cost of this construction and of the operation, maintenance, repair and improvement of it must be paid by the fixing of rates for the use of water by the domestic consumers thereof in the township in a sufficient amount to pay therefor and to pay for the cost of retiring the revenue bonds issued; that G. S. 1945 Supp. 80-1605, provided that any township in which a water-supply system is established was authorized to obligate the township to pay a reasonable price as rental for the installation and maintenance of fire hydrants or plugs and to pay a reasonable price for the water used for fire fighting or other emergency

purposes; that the township was authorized annually to levy an ad valorem tax upon all the property in the township sufficient to raise funds to pay for such reasonable rental. The petition then alleged that the township purchased and installed 316 fire hydrants along the mains composing this water system; that in the year 1942, although the fire hydrants were not rented, the township certified to the county treasurer a general tax against all the property within the township of 4.37 mills for the purported hydrant rental expense and for water department bonds and interest in the sum of $18,431.66; that this was in excess of $58 per hydrant as rental for and water used in the 316 hydrants for the year 1943 and would raise sufficient funds to pay approximately forty percent of the total requirements for the year 1943. The petition alleged that the cost of the hydrants by the township upon the water system installed was $82 per hydrant installed, and that the reproduction cost of new hydrants retired over a period of thirty years was $2.73 per hydrant per annum; that the maximum annual charge per hydrant for bond principal and interest is an amount equal to the cost of the hydrants installed or $4.43; that the maximum annual charge per hydrant for maintenance is $5 and the maximum annual charge for water used in said hydrants is $4.43 per hydrant; that the total of these costs per hydrant and for water used is $16.99 per annum.

The petition further alleged that the township had no authority to levy a tax against the general property of the township to raise money for the purpose of paying the rental on the fire hydrants when they were owned by the township and that if any tax might be lawfully levied for such purpose, the reasonable price as rental for the installation and maintenance of them and a reasonable price for the water used for the fire fighting purposes did not exceed the sum of $16.99 plus $3.01 for unforeseen contingencies, or a total of $20 per hydrant per year; that with the money then in the township hydrant rental fund and to be collected and placed in it, an ad valorem tax levy of 1.13 mills for 1942 upon the valuation of the general property in Wyandotte township was an adequate levy to enable the township to pay an annual hydrant rental of $20 per hydrant. The petition then alleged that the valuation of the property of plaintiff in the township to which this tax rate of 4.37 mills was applied is $535,109; that the levy resulted in a tax upon the property of plaintiff of $2,338.43 for the year 1943 for hydrant rental and for water

department bonds and interest; that the levy of 4.37 mills was entirely illegal and void, resulting in an unreasonable, excessive, illegal and void tax against the property of plaintiff; that when the township budget was published the plaintiff objected to the tax inasmuch as it exceeded 1.13 mills, which objection was denied; that thereafter the levy of 4.37 mills was illegally made by the township board for hydrant rental levy on all of the taxable property in the township for the year 1943; that prior to the 20th day of December, 1942, plaintiff paid the full amount of this hydrant rental tax and at the time of such payment filed with and served upon the county treasurer a written protest, as provided by G. S. 1945 Supp., 79-2005. A copy of the protest was attached to the petition. Within thirty days thereafter plaintiff filed a formal application with the State Commission of Revenue and Taxation for a hearing upon the protest and this application after hearing was denied. A copy of the order and opinion of the tax commission was attached to the petition. The prayer was for a holding that the tax levy of 4.37 was unreasonable, excessive, illegal and void and that the plaintiff was entitled to recover the alleged excessive amount and for its costs.

The protest set out the amount of the protested tax as $1,716.41 at the rate of 3.24 mills. There was then some computation set out in the protest, in the latter part of which we are interested. That was as follows:

|  | "As Per Budget | Budget as Should Be |
|---|---|---|
| . . . . . . . . . . . . . . | | . . |
| "Total 1942 ad valorem Tax Requirements.............. | 15,300.00 | 3,953.54 |
| Rate levied—4.37 mills on Wyandotte township valuation of $3,501,932 produces................................ | ........ | 15,303.44 |
| Rate necessary—1.13 mills on Wyandotte township valuation of $3,501,932 produces............................ | ........ | 3,957.18 |
| Excess rate 3.24 mills." | | |

The protest then stated that the sum of $58 as rental was excessive and unreasonable to the extent of $38 per hydrant per year and was violative of section 80-1605, G. S. 1945 Supp., and that any levy of an additional ad valorem tax which would raise a sum in excess of $20 per hydrant per year was illegal and void and a burden upon the general taxpayers in the township; that a reasonable value was $20. Items were then set out about as alleged in the petition. Recapitulated they were:

"Maximum annual charge for water used per hydrant................. $4.83
Maximum annual charge for bond principal and interest............ 4.43
Maximum annual charge for reproduction cost of new hydrant for re-
placement ................................................... 2.73
Maximum annual charge for maintenance......................... 5.00

Total annual cost per hydrant and water used................... $16.99'

The protest then stated that by adding 3.01 per hydrant per year resulted in a reasonable price as rental of $20.

The order of the Commission of Revenue and Taxation recited the amount of the levy and quoted G. S. 1945 Supp. 80-1605 and set out various details as to the water system; pointed out the calculations by which the taxpayer reached this conclusion that $20 per hydrant was a reasonable amount each year. The commission in its order then stated as follows:

"In support of these computations, the taxpayer says, in effect that in arriving at the rate of levy for water hydrant rental purposes, the Township is limited to a levy which will (1) pay the actual cost of the hydrants, together with the actual cost of installing or attaching the hydrants to the water mains, (2) the actual annual cost of maintaining and replacing such hydrants, and (3) the actual cost of water used by the Township for fire fighting or other emergency purposes.

"The Township does not seriously contest the taxpayer's contention that $20.00 per hydrant is a fair charge if the township is limited to a levy which will pay only those items which the taxpayer contends can be considered under the statute. The Township does contend that in arriving at its rate of levy for hydrant rental, it is not limited to the items set forth by the taxpayer. The Township says, in substance, that there is more involved in the installation and maintenance of fire hydrants than the mere actual cost of the hydrant, the cost of attaching it to the mains and the maintenance, repair and replacement of such hydrants. In other words, fire hydrants place additional demands upon a water system.

.    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"The Township employed engineers to make a study of the extra costs resulting to the system by reason of installing these hydrants and placing the mains and the system in general in position to service the hydrants for fire fighting purposes as distinguished from what the cost of the system for consumer's service only would have been. The estimate of these engineers indicates that the township could have saved approximately $164,120.13 by eliminating those expenses in connection with its system calculated for fire protection as distinguished from consumer's service. It is on the basis of this figure that the township's rental of $50.00 per hydrant has been determined. It is interesting to note that the taxpayer does not seriously contest the Township's computations if it can be said that in computing hydrant rental, the Township may go behind the actual cost of the hydrants installed or at-

tached to the water mains and include as an element of such rental the increased cost to the system as contended by the Township."

The commission then held that the protest was one over which the commission had jurisdiction and that in arriving at a rental for the installation and maintenance of fire hydrants and plugs and to pay a reasonable price for the water used for fire fighting or other emergency purposes the township could look beyond the actual cost of the water hydrants installed to a water main and the replacement of such hydrants and consider in arriving at such rental the increased cost of the water system made necessary to provide adequate water and water pressure through such hydrants.

To this petition the township demurred for the reason that it did not state facts constituting a cause of action in favor of plaintiff and against defendant. This demurrer was about to be sustained, whereupon the plaintiffs amended their petition by interlineation as follows:

"Plaintiff alleges that said commission's conclusions and order are contrary to law, arbitrary, unreasonable, capricious and illegal, and should be set aside and held for naught."

Upon this interlineation amendment being made, the demurrer was overruled. The township in its answer admitted the making of the levy, the issuance of the bonds, that the plaintiff protested the tax and filed an application with the State Commission of Revenue and Taxation but it denied that the orders of the commission were contrary to law or arbitrary or unreasonable or capricious or should be set aside and held for naught. The answer further contained a general denial. The trial court made findings of fact and conclusions of law as follows:

"1. The rate levied by Wyandotte Township for water hydrant rental fund, 4.37 mills, on a township valuation of $3,501,932.00, producing $15,303.44. Excess rate protested by plaintiffs, 3.24 mills. Rate not protested, 1.13 mills. Balance of budgeted amount of $18,461.66 derived from cash on hand, plus payments of delinquent taxes.

"2. The term 'fire hydrant rental,' while perhaps a misnomer, has had a well recognized meaning throughout practically the entire history of water works construction, operation and management in both municipally and privately owned utilities, and is merely a convenient method of fixing the charge for fire protection service, including a proportionate part of the total cost of the utilities installation necessitated by the furnishing of said fire protection, including not only the hydrant itself and the actual cost of connecting it to the main, but the other features that may be shown by evidence

such as the increased cost of larger mains, reservoirs, towers, pressure requirements and other items.

"3. That this is a well recognized and approved engineering practice to figure 'fire hydrant rental' based upon the elements set forth in Finding No. 2.

"4. That the facts set forth in Findings numbered 2 and 3 are of common knowledge, are used in numerous localities in Kansas, and undoubtedly were within the purview of the legislature at the time Section 80-1605 was amended by Chapter 379, Section 2, L. 1937.

"5. That the levy in this case of 4.37 mills for the water hydrant rental fund of Wyandotte township in this case, was reasonable.

"6. That the sum of $18,431.66, as set forth in the township budget was a reasonable price for said township to pay as rental for the installation and maintenance of fire hydrants or plugs and for water used for fire fighting or other emergency purposes under the facts shown by the evidence on this case.

"7. That in figuring a reasonable price to pay as rental for the installation and maintenance of fire hydrants or plugs and for water used for fire fighting or other emergency purposes, under the evidence in this case, the township is not limited to the actual cost of the hydrant or plug, the labor of installing or attaching it to the main, plus the interest over the bond period on these items, plus replacement costs, plus the 'cushion' figure for unexpected emergency, but may also include the actual cost of effectively installing said fire hydrants or plugs so that they may effect the purpose of their being, including additional costs of larger mains, reservoirs, stand tower, pressure requirements, and other items."

### "Conclusions of Law

"1. Section 80-1605, 1941 Supplement, G. S. 1935, permits any township in which a water system is established under the provisions of this act, to obligate the township to pay a reasonable price as rental for the installation and maintenance of fire hydrants or plugs, and to pay reasonable prices for the water used for fire fighting or other emergency purposes, and to levy a general tax to pay said obligation, where said township operates the water system, and such obligation may extend for a period of years not longer than the period for which the revenue or additional revenue bonds were issued.

"2. Section 80-1605, 1941 Supplement, G. S. 1935, confers the power upon townships therein described to pay a reasonable rental for installation and maintenance of fire hydrants or plugs and for water used for fire fighting or other emergency purposes, and authorizes a rental charge not only for the actual charge of the hydrant itself, together with the cost of installing the same in place, plus an amount for maintaining the hydrant in place, plus a reasonable price for water used 'for fire fighting or other emergency purposes,' plus a 'cushion' for unexpected emergencies, but further includes an amount necessary in any given case to cover the cost of installing the necessary mains for bringing the water to the fire hydrant or plug, maintaining the necessary pressure required for fire fighting purposes, and all the

'other elements necessary to furnish fire fighting protection, as may be established by the evidence in any given case.

"3. Section 79-2005, 1941 Supplement G. S. 1935, furnishes a protesting tax payer an election between two courses of redress, and the tax payer is bound by his election.

"4. The order of the State Commission of Revenue and Taxation heretofore issued in this case on May 29, 1943, was neither illegal, oppressive, arbitrary, nor unreasonable, but on the contrary was a valid exercise of said Commission's authority, was supported by competent evidence, and was a legal and proper exercise of the authority conferred upon it by law."

Judgment was entered in accordance with the foregoing conclusions.

The plaintiff filed a motion to set aside the findings for the reason that they were not supported by the evidence, and for a new trial. These motions were overruled.

There is not very much dispute about the facts in this case although considerable evidence was taken before the tax commission and the transcript of that evidence was used before the trial court.

The trial court stated the issue very well in finding 7. The taxpayers argue that the township is limited to the actual cost of the hydrant or plug, the labor of installing or attaching it to the main, plus the interest over the bond period of these items, plus replacement costs, plus the cushion figure for unexpected emergency. The township argues that it may include the above items and besides may include the actual cost of effectively installing the hydrants so they may effect the purpose of their being, including additional costs of larger mains, hydrants, reservoirs, stand tower, pressure requirements, and other items. All parties agree that if the statute sustained the position of the taxpayer this judgment should be reversed and if it sustains the position of the township, the judgment should be affirmed.

The township built a water system partly in 1938, partly in 1941, under the statutory authority of article 16 of chapter 80 of our General Statutes. These statutes as amended may be found in G. S. 1945 Supp. 80-1601 to 80-1605.

The first argument of the taxpayer is that the act originally provided for the building of a water system in certain townships and that revenue bonds might be issued to pay the cost; that these bonds should be a lien upon the system and revenue derived therefrom and that, therefore, moneys to be secured from general taxation through ad valorem levies cannot be used to provide the funds to

pay these bonds. It should be added here that we do not find in the argument of the taxpayer any contention that this statute violates the constitution.

The statute was first enacted at the special session of 1933, being chapter 125 of that session. Section 1 of that act provided that in townships located in whole or in part within three miles of cities of certain specified population when a sufficient number of agreements or subscriptions to purchase water at a specified schedule of rates for a period of not less than three years, signed by the owners of property lying within a township or any adjoining township which would permit the liquidation of the cost of constructing water mains from the revenue derived from the sale of water therefrom in accordance with the provisions and requirements of the national industrial recovery act should be presented to the township board, that board would be authorized to contract for the construction or to construct water mains, to purchase water from the mains of the adjacent city and to operate and maintain the water system thereby created or to contract for such construction or maintenance and to use such funds as might be available for such construction.

Section 2 provided that the township board might issue revenue bonds to finance the cost of construction of such water mains and such bonds should be a specific lien upon such water system so constructed and the revenues derived therefrom and should in no case be a debt secured by any other property within the township and no special election should be required.

Section 3 provided for the sale of the bonds.

Section 4 provided for their maturity.

Section 5 provided that the township trustees were authorized to contract with any school district, rural high-school district, or with the board of county commissioners of the county to supply water for any school building or county institution and the board of county commissioners were authorized to contract and pay a reasonable price for such water and that such contract should extend for a period of years not longer than the period for which the revenue bonds were issued.

We are told in the briefs, and everybody agrees, that the funds to become available referred to in section 1 were provided by the Works Progress Administration of the federal government. These funds amounted to around a million dollars. They were used in a large measure to pay for the labor used in the construction of

this project. At any rate, in 1938 and 1942, the defendant township proceeded to operate under this section and issued two series of bonds, one for $175,000 and one for $315,000. In due time the day of payment arrived.

The act provided a plan by which it was not necessary to have an election to acquire the necessary funds to build this system because as section 1 provided it should not be operative unless a sufficient number of property owners should agree to take water at specified rates so that there would be enough money available to liquidate the cost of construction of the water mains.

This chapter was published in G. S. 1935 as 80-1601 to 80-1605, inclusive. It was amended by chapters 378 and 379 of the Laws of 1937. Chapter 378 amended G. S. 1935, 80-1601, in some particulars with which we are not here concerned. It merely broadened the scope of the act by changing the limitations as to townships that could operate under it.

Section 1 of chapter 379 of the Laws of 1937 amended G. S. 1935, 80-1602, the same being section 2 of chapter 125 of the Special Session of 1933, by authorizing the issuance of additional bonds, and to pledge for their payment the revenues of the water system "together with the additional revenues of said water system as so constructed." There were some additional restrictions on bond issues in which we are not now interested.

Section 2 of chapter 379 is so important in this action that it will be set out in full. It first reënacted G. S. 1935, 80-1605. That part of the section reads as follows:

"The board of township trustees of any township to which this act applies are expressly authorized to contract with any school district, high-school district, or with the board of county commissioners of the county in which said township is located, for the purpose of supplying water for any school building or county institution, and said school board or county commissioners are hereby authorized to contract and pay a reasonable price for such water, and such contract may extend for a period of years not longer than the period for which revenue or additional bonds are issued."

It then amended the chapter by adding a proviso, as follows:

"Provided, That any township in which a water system is established under the provisions of this act is hereby authorized and empowered to obligate the township to pay a reasonable price, as rental for the installation and maintenance of fire hydrants, or plugs and to pay a reasonable price for the water used for fire fighting or other emergency purposes and such contract may extend for a period of years not longer than the period for which the revenue or additional revenue bonds were issued. For the purpose of raising funds to pay

for such rental of fire hydrants and water used, said township board is hereby authorized and empowered to levy annually, a tax sufficient to raise the amount necessary. The levy herein authorized shall be in addition to all other levies authorized or limited by law." (G. S. 1945 Supp. 80-1605.)

This is the proviso pursuant to which the levy was made which brought on these actions.

Section 1 of this chapter speaks of "revenue bonds," provides that the bonds shall be a specific lien upon the water system and "the revenues derived therefrom" and shall in no case be a debt guaranteed or secured by any other property within the township. That is the language in the act upon which plaintiff taxpayers rely in the argument we are discussing.

The proviso of the very next section we have quoted empowers the township "to obligate the township to pay a reasonable price as rental for the installation and maintenance of fire hydrants," and "to pay a reasonable price for the water used for fire fighting," and empowers the township "to levy annually a tax sufficient to raise the amount necessary," and provides further that such tax shall be in addition to all other levies authorized or limited by law. In this proviso is the first time the words "fire fighting" or "other emergency purposes" are used. At any rate, we find both the above provisions in the same chapter. Are they inconsistent? We think not. In section 1 the legislature was dealing with the revenues to be had from water sold to users other than the township, the property owners in the township, who used water. No doubt these taxpayer plaintiffs are among these. In the proviso the legislature was dealing with the public use of water to put out fire, man's greatest blessing, and uncontrolled his most dreaded enemy. Fire fighting has been a public function from the beginning. Engineers of both parties testified that waterworks systems have two purposes—first the furnishing of water for ordinary consumption—second, the furnishing of a public fire protection service. This water system was first undertaken in 1938 after the enactment of the proviso. The plaintiffs do not argue that the statute is invalid. Indeed they recognize its validity when they protest only what they deem the unreasonable portion of the tax. They paid what they deemed to be a reasonable amount of ad valorem tax without protest. They brought the actions for only that part of the taxes they paid under protest.

Plaintiffs next argue that the taxing authority conferred by the

proviso cannot extend beyond the hydrants and the water passing through them—hence, say the plaintiffs, "the maximum limitation on a reasonable price to pay as rental is $20 per hydrant per year." They base this figure on what their engineers say is the reasonable cost of the initial and replacement cost of the hydrants, their installation, their maintenance, and the cost of water used for fire fighting and other emergency purposes plus a figure for unforeseen contingencies.

Plaintiffs attempt to sustain this position by citing cases holding that tax statutes will not be extended against the taxpayer by implication and by arguing that the clear import of G. S. 1945 Supp. 80-1601, is that the mains were to be paid for from the revenues only. They then argue that it is contrary to the statute's general purpose to permit the levy of a tax for the purpose of paying part of the cost of construction. Again we must refer to the fact that the taxpayers do not argue that the statute is invalid. They only argue for a different construction than that put upon it by the township, the commission of revenue and taxation and the trial court. The question of whether the figure used by the township for the cost of the hydrants is a reasonable one was a subject of consideration before the tax commission. There was evidence both ways upon it. The trial court and the commission concluded it was reasonable.

Does the statute mean that the township may levy an ad valorem tax to pay for the items to which reference has been made, that is, for the additional cost of larger mains, reservoirs, stand tower and pressure requirements? What is the meaning of the term "reasonable price as rental" as used in the statute under consideration?

G. S. 1935, 77-201, subparagraph 2, provides as follows:

"Words and phrases shall be construed according to the context and approved usage of the language; but technical words and phrases, and such others as may have acquired a peculiar and appropriate meaning in law, shall be construed according to such peculiar and appropriate meaning."

Does this term have a technical meaning? The township refers us to a statement in the Journal of the American Water Works Association for June, 1940. There it was said:

"The fire protection service charge is usually termed a 'fire hydrant rental,' which is really a misnomer, and misleading since fire hydrants are but a small part of the facilities in all water works systems which are provided solely or largely for fire protection. A fire hydrant rental, if charged, is

merely a convenient method of fixing the charge for fire protection service and is rarely equal to the cost of such service.

"From a business standpoint, every municipality should credit the water department, from its general fund, with an amount equivalent to that portion of the cost of maintenance and operation, as well as the amortization of the capital costs, of all its facilities, from the source of water supply through the pumping station and distribution system to the fire hydrants, which are provided for fire protection. All of these facilities must be greater in capacity and usually much greater than necessary for purely domestic service, to provide the relatively high peak loads necessary at times of fire. This is especially true in the case of the storage facilities and the *water mains* (italics by appellees).

"A careful analysis of the total annual expenditures of any water works system, including amortization of construction, depreciation, etc., and including maintenance and operation, will show a surprisingly high percentage of this yearly cost attributable to fire protection.

"Because the same water works system is jointly used to furnish these two major services, the total cost of service should be divided and a reasonable portion assigned to and charged for public fire protection service. The task of dividing the total cost of service between the two major uses has always been a rather perplexing one. Furthermore, there is a difference of opinion as to the form or type of rate by which the costs of supplying public fire protection service should be recovered."

This is the standard Journal dealing with the art of building waterworks systems.

There was substantial evidence before the tax commission that before fire hydrants would be of any value whatever in fighting fire they must of necessity be served by larger mains, reservoirs, a stand tower and other additional pressure requirements that would not be necessary were the system not designed for fire fighting.

Appellants argue that the purpose from the beginning was that the water-supply system should be financed by sales of water to domestic and commercial consumers. This argument would be a potent one had a system been built to furnish such commercial water only. However, pursuant to an amendment of the statute, to which we have heretofore referred, this system was built for the purpose of furnishing commercial water, water for homes and fire fighting water besides. This furnishing of fire fighting water is what requires the installation of the fire plugs and the additional mains, towers and other items of cost. There is no point in quoting the evidence extensively but the township engineer testified as follows:

"Q. What relationship do the fire fighting requirements bear to the consumer service? A. That varies in different communities. On this particular system the fire fighting requirements are greatly in excess of any domestic requirements. That is, the stand-by service that had to be made available for the fire hydrants was greatly in excess of the domestic requirements, and the design was based on fire flow requirements rather than domestic consumer requirements.

. . . . . . . . . . . . . . .

"A. . . . Under the Underwriters' requirements it is necessary to produce a flow of five hundred gallons per minute at any point in the township for fire fighting in order to get insurance reduction.
"Q. Does this system produce this? A. Yes, sir."

. . . . . . . . . . . . . . .

"Q. So that the system itself is twice as large as would be required for consumer service only; is that correct? A. That is correct.

. . . . . . . . . . . . . . .

"Q. Mr. Myers, in your capacity as an engineer dealing with hydraulics, have you ever heard of the phrase 'rental for installation and maintenance of fire hydrants'? A. I have heard the term 'hydrant rents,' yes. That is a common term.
"Q. The same thing? A. Yes, sir."

There is also ample evidence in the record to the effect that where the term "rental" is used in speaking of fire hydrants it does not mean rental in the ordinary sense of the term but in the art of building water systems "hydrant rental" is a word used to describe the entire additional cost attendant on the building of a water system to meet the requirements of fire fighting.

This is the opinion held by the commission of revenue and taxation. In its order the commission stated:

"Proceeding now with the determination of the issue presented by the protest, it must be concluded that the levy for water hydrant rental purposes as made by Wyandotte Township is a reasonable and legal levy if it may be said, as is contended by the Township, that in arriving at a rental for the installation and maintenance of fire hydrants and plugs and to pay a reasonable price for the water used for fire fighting or other emergency purposes, the Township may look beyond the actual cost of the water hydrants installed to a water main and the maintenance and replacement of such hydrants and consider in arriving at such rental the increased cost of the water system made necessary to provide for adequate water and water pressure through such hydrants. We believe the Township may do this. The statute does not attempt to say or limit the items which constitute installation and maintenance of fire hydrants or plugs; the statute does not say that the rental price shall be the cost only of purchasing the plugs, affixing them to the water mains and the maintenance of the plugs then installed. Counsel for the Township, at the

hearing and in their briefs, have introduced authorities to the effect that the term 'hydrant rental' has come to have a recognized meaning in the engineering and utilities field; that in the case of private utility providing fire protection to a city the courts have recognized that in fixing a fair rate for such service, the utility is entitled to include as one of the elements of the rate the actual cost imposed upon its system by reason of such service and receive a fair return on this figure. We believe the rule to be no different in the case of a Township than in the case of a private utility. If a private individual were to demand fire protection from the Township or if the Township were forced to obtain fire protection from another township maintaining a water system, we believe that township, in determining the rental to be charged the lessee would of necessity be permitted to charge a rate which would pay for the hydrants, the cost of installation and the water furnished and also defray the additional expense which such service would cast upon the system. This seems to be the general rule as to the elements permitted in fixing rental rates in the utility field. Unless 80-1605 is construed as limiting this rule, these principles should apply here. We do not construe 80-1605 as so limiting these principles.

"Having concluded that the Township, in arriving at its levy, may consider the element of system cost necessitated by providing such fire protection, we are faced with the question of whether or not the rental as determined by the Township is reasonable. From all of the evidence, we cannot find the rental unreasonable. The Board, in arriving at such a rental, employed competent and qualified engineers who arrived at this figure by means of calculations recognized in the engineering field for this purpose. The Board adopted the recommendations of these engineers. It, therefore, follows that the taxpayer's protest should be disallowed."

The trial court agreed with this conclusion.

Chapter 37 of the Laws of 1881 was a general act providing for the incorporation and regulation of cities of the first class and defining many of the powers of the cities. Section 35 gave the mayor and council authority first to erect, maintain and operate a waterworks system and to prescribe rates at which the water should be supplied to the inhabitants of the city. It then conferred the authority to grant the right to a corporation or person to erect a waterworks system. The section then conferred on the mayor and council in case they should grant the right to maintain a water system to another to levy a tax to pay for the water furnished the city. It then conferred on the mayor and council the power to fix reasonable rates to be charged private persons or corporations who use water. The next section with which we are concerned uses the following language:

"The use of fire hydrants rented by the city  .  .  ." (§ 37.)

The act was a comprehensive one intended to cover all phases of city activities, including waterworks. Since the only provision in the chapter for payments by the city was simply for the payment by it for water used we are warranted in assuming that the words "fire hydrant rented by the city" were used as a measure of the amount that should be paid for the use of water. The act provided that the rates to the consumers as fixed by the mayor and council should be reasonable. In arriving at a reasonable rate to consumers surely all the items of cost of furnishing the water would properly be considered. No doubt the meaning of the statute was that the city should pay a reasonable amount for the water it should use in fire fighting. At any rate, it was to be paid on the basis of the number of hydrants used and maintained and a distinction between water to be sold to users and that used by the city was recognized.

In our early reports this distinction was recognized and the term rent and pay for a hydrant was used. *Manley v. Emlen*, 46 Kan. 655, 27 Pac. 844, was an action to enjoin the collection of a waterworks tax in the city of Atchison.. The opinion pointed out that by ordinance the city was to rent and to pay for a certain number of hydrants. Unfortunately the amount the city was to pay for each hydrant is not stated in the opinion but it is clear that the term "rent" and "hydrants" was used as a means of measuring how much the city should pay for the water it used as distinguished from that used by the inhabitants of the city.

*Waterworks Co. v. City of Columbus*, 46 Kan. 666, 26 Pac. 1046, was a mandamus action to compel the city of Columbus to levy a tax to raise a sum "with which to pay for the use of fifty hydrants," for 1891. The term "pay for the use of hydrants" was used in the ordinance and throughout the opinion. The method of calculating the rental was not discussed in the opinion because apparently not raised, but it is interesting to note that it was $60 a hydrant per year. The court upheld the tax.

*Waterworks Co. v. City of Columbus*, 48 Kan. 100, 27 Pac. 1097, was a mandamus action to compel the city of Columbus to levy a tax to pay hydrant rental for 1892. From reading the opinion it is clear that the term "hydrant rental" is used to describe the method of measuring the amount of water used by a city for fire fighting. The term was then given a technical meaning in our statutes, substantially the same as that given by the journal just quoted.

*Milo Water Co. v. Inhab. of Milo,* 136 Me. 228, was an action by a water company to recover from the city an amount claimed to be due for fire protection service. In 1909 the town agreed to pay $15,000 a year for the use of forty hydrants. A controversy arose between the water company and the city. The Public Utilities Company of Maine ordered and increased its "hydrants rental" to $40 per hydrant. Later it ordered an increase in the "hydrant rental" from $40 to $60. Throughout the opinion it is clear that the city attempted to treat the term "hydrant rental" about as the plaintiff here claims it should be treated. The court refused to follow this argument and said:

"From these it is apparent that the commission was endeavoring to provide adequate revenue for the water company and for a proper apportionment of charges between the municipality and private consumers. When the town as it had a right to do collected from the company taxes which became a part of its operating expenses, rates for fire protection were raised." (p. 231.)

*York, Appel., v. Public Service Com.* (No. 1), 85 Pa. Superior Ct., 134, is a case where for some unknown reason the water company had been furnishing free water to the city for fire protection. The city had erected and maintained the hydrants. The court held that it was not incumbent upon the city to install the hydrants nor for the water company to furnish free water to the city. A rate of $60 per hydrant was approved by the commission. The court in considering whether or not this charge was reasonable said:

"The company is required to furnish water for household consumption and also for fire protection, but we do not see that this requirement affects the right of the company to charge for fire protection and in ascertaining what it shall charge for such protection it has a right to consider the additional cost of providing such protection in relation to the entire cost of its system and to approximate thereby what should be charged for such service. This is not abrogating any charter provision." (p. 138.)

To the same effect is *Keystone Investment Co. v. Metropolitan Utilities District,* 113 Neb. 132, 202 N. W. 416.

It will be remembered these actions were brought to recover the difference between what the taxpayers say they should pay and what all these administrative bodies say the taxpayers should pay.

The position of the taxpayers in this action is in reality that as a matter of law the figure at which they have arrived for a reasonable price to be paid for hydrant rentals is $20 per hydrant. To put it another way, they say this court should approve the figure at

which their engineers arrived and overturn the figure at which the engineers for the township arrived and which has been approved by the township, the trial court and the tax commission.

We hold that the question as to whether the township was entitled to consider all the items it did consider in arriving at a reasonable price as rental for the installation and maintenance of the fire hydrants or plugs was correctly answered by the commission of revenue and taxation and the trial court in favor of the township.

Plaintiffs next argue that the township did not have any right to levy any ad valorem tax at all to pay for the installation and maintenance of hydrants under the circumstances herein involved. They make this argument notwithstanding the fact that they paid only part of the taxes under protest and have brought this action to recover only the part thus paid under protest. They, in this action, point out the language wherein the township is authorized "to obligate the township" to pay a reasonable price as rental. They argue that this gives the township authority to contract with itself and such a contract is invalid for lack of parties. They argue that if the contract is invalid then the ad valorem tax levied for the purpose of paying the cost of contract is invalid. Again they point out no constitutional weakness in this statute. This argument overlooks the problem with which the township was confronted and with which the legislature desired to authorize it to deal. There is no question here of a formal contract between any parties. The township is obligated to pay a reasonable price for the maintenance of fire hydrants when its governing board acting under this statute sees fit to take advantage of this provision in the statute. The statute is explicit that the price for rentals must be reasonable, and that the price for water charged for fire fighting must be reasonable. It is difficult to see how the taxpayer is prejudiced by the lack of any formal contract. Once the township officials decide to take advantage of this proviso, and, in addition to furnishing water for domestic and commercial purposes, decide to furnish it for fire fighting purposes, the township is obligated to pay a reasonable price therefor. The statute provides that the township board is authorized to levy annually a tax sufficient to raise the amount necessary. What is the amount necessary? It is enough to pay a reasonable price for the use of fire hydrants and for the water used. While a tax statute will not be extended by implication or beyond the clear import of the language used, there is a clear duty on the court to so construe a statute as to carry out the intention

and purpose of the legislature in passing it. See *Equitable Life Assurance Society v. Hobbs,* 154 Kan. 1, 114 P. 2d 871. On the question of what was the intent of the legislature in enacting this proviso in 1937 the provisions of chapter 348 of the Laws of 1939 are of interest. That chapter gives townships such as the defendant township in this action authority to levy a tax not exceeding one mill upon a dollar for the purpose of creating a township fire department. These statutes indicate an intention on the part of the legislature to permit townships to take a much more active part in affording fire protection for their inhabitants than has heretofore been the practice in this state.

We hold that this statute confers the right upon the township in making a levy in order to pay a reasonable price as rental for the installation and maintenance of fire hydrants and for water used for fire fighting to consider all the items the township did consider in this case.

The judgment of the trial court is affirmed.

THIELE, J. (dissenting): In my opinion a proper disposition has not been made of this appeal. Very briefly stated, my reasons for dissent are as follows:

The act under which this township waterworks system was installed was first enacted in 1935 and has been subsequently amended and now appears as G. S. Supp. 1945, 80-1601 *et seq.* In its general aspects the act provides for certain preliminary proceedings authorizing the township board to issue revenue bonds to cover the costs of constructing water mains in the township, the bonds to be retired from the revenue derived from the sale of water therefrom. These bonds are issued without any vote of the taxpayers of the county and it is clear from the statute that the bonds are to be paid from proceeds of the sale of water and not as the result of taxation. As originally drawn, the act contained no provision whatever for a tax levy to pay for anything connected with the construction or maintenance of a waterworks system in any way whatever. Prior to 1937 the board of township trustees was authorized to contract with any school district, rural high-school district or with the board of county commissioners for the *sale of water* for school and county purposes. (G. S. 1935, 80-1605.) In 1937 the section was amended by adding the following proviso:

"*Provided,* That any *township* in which a water system is established under the provisions of this act *is hereby authorized and empowered to obligate the*

*township to pay a reasonable price as rental for the installation and maintenance*
*of fire hydrants or plugs, and to pay a reasonable price for the water used for*
*fire fighting or other emergency purposes,* and such contract may extend for a
period of years not longer than the period for which the revenue or additional
revenue bonds were issued. For the purpose of raising funds to pay for such
rental of fire hydrants and water used, said township board is hereby authorized
and empowered to levy annually, a tax sufficient to raise the amount necessary.
The levy herein authorized shall be in addition to all other levies authorized
or limited by law." (Laws 1937, ch. 379, § 2. Italics supplied.)

It will be observed that the only obligation a township may as-
sume under the proviso is to pay a reasonable price as rental for the
installation and maintenance of fire hydrants or plugs and to pay a
reasonable price for water used for fire fighting or other emergency
purposes, and to levy a tax sufficient to pay the amount necessary
therefor.

The record in this case clearly discloses that the township board
has levied a tax which will raise an amount much larger than is
necessary to pay for the installation and maintenance of fire hy-
drants or plugs and to pay a reasonable price for the water used for
fire fighting or other emergency purposes. In order to meet some
so-called fire underwriter requirement as to the size of hydrants,
the township put in larger mains than were otherwise authorized
or required as well as water towers and other equipment, a large
portion of the cost of which it now seeks to pay for out of a tax
levied for the ostensible purpose of paying hydrant rental.

I do not believe the legislature ever intended by the exception or
proviso written into the statute that a water plant could be con-
structed by using proceeds of revenue bonds issued without an elec-
tion, which bonds were to be paid from proceeds of the sale of water,
and that thereafter the township board was at liberty to levy a tax
to pay a substantial part of the cost of the entire improvement
under the guise that the tax was to pay "a *reasonable* price as *rental*
*for* the installation and maintenance of *fire hydrants or plugs,* and
to pay a *reasonable price* for the *water used* for fire fighting or other
emergency purposes." The levy made would produce a sum far in
excess of an amount needed to pay a reasonable price as rental for
fire hydrants or for water used for fire fighting. The appellants
paid a sum which the evidence disclosed fully covered a reasonable
cost, and paid the excess under protest. I believe they should have
had judgment.

I am authorized to say that Mr. Justice Wedell and Mr. Justice
Hoch concur in the views herein expressed.